# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRAIG HEALY, | No. CIV S-09-1378-CMK |
| Plaintiff, | |
| vs. | MEMORANDUM OPINION AND ORDER |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

Plaintiff, who is proceeding with retained counsel, brings this action for judicial review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g). Pursuant to the written consent of all parties, this case is before the undersigned as the presiding judge for all purposes, including entry of final judgment. See 28 U.S.C. § 636(c). Pending before the court are plaintiff's motion for summary judgment (Doc. 20) and defendant's cross-motion for summary judgment (Doc. 28).

/ / /

/ / /

/ / /

# I. PROCEDURAL HISTORY

Plaintiff applied for social security benefits on October 18, 2005.  In the application, plaintiff claims that disability began on October 1, 2003.  Plaintiff claims that disability is caused by a combination of degenerative joint disease, osteoarthritis in the thumb and toes, and borderline intellectual functioning.  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on May 15, 2008, before Administrative Law Judge ("ALJ") Peter F. Belli.   In an August 5, 2008, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

1. The claimant has the following severe impairment: degenerative joint disease;

2. The claimant does not have an impairment or combination of impairments that meet or medically equal an impairment listed in the regulations;

3. The claimant has the residual functional capacity to perform the full range of medium work; and

4. The claimant is capable of performing his past relevant work as a concrete labor foreman.

After the Appeals Council declined review on March 16, 2009, this appeal followed.

# II. SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following evidence, summarized chronologically below:

<u>March 8, 2004</u> – Chiropractic records indicate that plaintiff complained of neck stiffness following yard work.

<u>March 23, 2004</u> – Records from plaintiff's chiropractor indicate that plaintiff's pain had increased following installation of a sprinkler system.

<u>March 26, 2004</u> – Plaintiff reported to his chiropractor that his back pain had increased following ditch digging/trenching.

1            <u>April 27, 2004</u> – Emergency room notes indicate that plaintiff sustained a minor
2  eye injury while using a grinder earlier in the day.
3            <u>October 8, 2004</u> – Chiropractic notes indicate that plaintiff complained of
4  increased back pain after moving boxes and furniture.
5            <u>November 8, 2004</u> – Treatment notes from plaintiff's chiropractor indicate that
6  plaintiff was doing yard work.
7            <u>November 12, 2004</u> – Chiropractic notes indicate that plaintiff was doing yard
8  work.
9            <u>December 22, 2004</u> – Chiropractic treatment notes indicate that plaintiff
10  complained of increased pain following yard work.
11            <u>January 21, 2005</u> – Plaintiff related to his chiropractor complaints of increased
12  pain following yard work.
13            <u>February 1, 2005</u> – Notes provided by plaintiff's chiropractor reflect that plaintiff
14  complained of increased pain following a one-week trip where plaintiff drove to Oregon to assist
15  a friend with home repairs and yard work.
16            <u>March 4, 2005</u> – Chiropractic treatment notes reflect that plaintiff had been
17  trimming trees and clearing weeds.
18            <u>March 18, 2005</u> – Chiropractic notes show that plaintiff "cut 4 trees down,
19  installed bathtub."
20            <u>April 20, 2005</u> – Plaintiff reported to his chiropractor that his pain had increased
21  following repairing a garage door.
22            <u>April 24, 2005</u> – Chiropractic notes indicate that plaintiff reported increased pain
23  following yard work.
24            <u>May 6, 2005</u> – Plaintiff reported to his chiropractor that his pain had increased
25  following a trip to Oregon where he did house work and yard work.
26  / / /

<u>June 27, 2005</u> – Plaintiff reported to his chiropractor complaints of increased pain following mowing his lawn.

<u>November 11, 2005</u> – In a pain questionnaire, plaintiff stated that he is able to walk 1-2 blocks, can stand/sit for 1-2 hours at a time, drives his own car, and is able to do light housework.

<u>December 12, 2005</u> – Agency examining doctor Rajeswari Kumar, M.D., reported on a complete orthopedic evaluation. Dr. Kumar reported the following history:

> The claimant reports that he had laceration of the left thumb and this was a work-related injury. He reports that the injury occurred about 10 or 15 years ago. He reports that he underwent repair of the laceration. He reports that he was able to return to his work. He worked in construction and noticed gradual onset of lower back pain and neck pain due to repeated lifting, bending, and stooping activities. He also started experiencing bilateral knee pain.
>
> He reports that about three years ago, he retired. However he did not have any relief of symptoms and the pain is progressively getting worse. He is being followed by the doctor intermittently for the past few years. However, he reports that he has been to the doctor only a few times. He has been taking medications for pain relief. His workup in the past includes x-rays, which were done several years ago. His pain in the neck is constant. Lower back pain is constant. He denied any radicular symptoms and reports numbness in the left thigh intermittently. He also reports joint pain in both upper extremity and lower extremity joints. He reports muscle spasms in both lower extremities. The pain is sharp, throbbing, and burning and is aggravated with sitting, standing, walking, bending, and lifting. He reports that he can do all these activities; however, after finishing the work or finishing the activity, he experiences pain. He reports that the previous treatment has minimally improved his symptoms.

Plaintiff told the doctor that he is independent in all activities of daily living. On physical examination, Dr. Kumar reported and opined as follows:

> On physical examination, his gait is nonantalgic. He is able to take a few steps on heels and toes. Cervical spine and lumbar spine range of motion is sightly restricted. No clinical evidence of radiculopathy. Examination of both shoulders and elbows show normal range of motion. There was no specific joint tenderness. The wrist range of motion is slightly restricted, but there is no evidence of joint tenderness or joint effusion. He has chronic ostroarthritic changes in the MP joints of the thumb bilaterally. His lower extremity exam shows normal range of motion without any specific joint tenderness. Even though he has chronic ostroarthritic

changes in his fingers, his grip strength is normal bilaterally. There is no evidence of carpal tunnel syndrome.

Dr. Kumar did not offer any functional assessment.

<u>January 3, 2006</u> – Agency consultative doctor S.A. Jaituni, M.D., submitted a physical residual functional capacity assessment form. The doctor opined that plaintiff can occasionally lift/carry 50 pounds and frequently lift/carry 25 pounds. Plaintiff is able to sit/stand/walk for six hours in an eight-hour day. Plaintiff's ability to push/pull is unlimited. As to postural limitations, the doctor opined that plaintiff can frequently climb, balance, and kneel, but only occasionally balance, stoop, crouch, or crawl. As to manipulative limitations, plaintiff's ability to reach in all directions and feel is unlimited, but he is limited in his ability to perform tasks involving fingering and handling. No visual, communicative, or environmental limitations were noted.

<u>March 8, 2006</u> – Glynn E. Garland, M.D., performed an orthopedic evaluation and reported his findings. Dr. Garland noted that a February 27, 2006, MRI study showed "mild disc narrowing at L2, moderate disc narrowing at L3, moderate stenosis on the left at L4, and moderate stenosis on the right at L5." Objective, Dr. Garland listed the following "factors of disability": reduced range of motion in the cervical and lumbar spines and both wrists and the MRI study. The doctor offered the following opinions:

> Mr. Healy has a disability in the open labor market with regard to his neck which precludes him from activities requiring repetitive motions and prolonged upward and downward gazing.
>
> He has a disability in the open labor market with regard to his shoulders which precludes him from using them for repetitive heavy lifting, repetitive reaching, forceful pushing, pulling, and using the upper extremities for work over shoulder height in a repetitive manner.
>
> Work restrictions for Mr. Healy's right hand preclude him from activities requiring repetitive forceful gripping, grasping, pinching, holding, and torquing with the right hand.

///

> Mr. Healy has a disability in the open labor market with regard to his upper and lower back which precluded him from heavy work and prolonged sitting.
>
> Work restrictions for Mr. Healy's knees preclude him from activities requiring him to do repetitive climbing, crawling, squatting, pivoting, running, and jumping.

Dr. Garland noted the need for additional diagnostic studies, including an MRI and x-rays.

<u>July 26, 2007</u> – A letter from the senior records clerk at Casa Roble Fundamental High School reflects that plaintiff was in special education between 1971 and 1975.

<u>October 18, 2007</u> – Vocational Consultant Robert A. Nelson reported on a vocational assessment requested by plaintiff's attorney. As part of the interviews for the assessment, plaintiff told Mr. Nelson that he helps his elderly aunt and uncle once a week on their five-acre horse farm.

<u>November 27, 2007</u> – Agency examining psychologist Michelina Regazzi, Ph.D., reported on a psychological evaluation. Plaintiff reported that he had never been treated for any psychiatric problem. As to daily activities, the doctor stated:

> Mr. Healy reported that he gets up by 9:00 or 10:00 a.m. He stated that his bathing and grooming habits are fine. He stated that it takes him three or four hours to get moving around. He stated that the cooking and cleaning chores are shared. He stated that he has a valid driver's license and his own vehicle. He stated that he goes to the store with his girlfriend. He does his own finances and uses a checking account. He explained that his mother created a "cheat sheet" for him so that he can write out the numbers on the checks. He stated that he has no difficulty understanding purchases.

Following a mental status examination, the doctor offered the following functional assessment:

> <u>Daily Living Activities</u>: Mr. Healy is capable of carrying out basic personal care tasks. He can bathe and dress independently. He can prepare simple meals for himself. He can conduct household chores. He reports that he can travel independently. He reports that he can make purchases independently. He reports that he needs assistance with most tasks that involve written communication such as reading and understanding correspondence and completing forms. There are moderate impairments in his daily activities in comparison with same-age peers.

///

Concentration/Persistence/Pace: Mr. Healy demonstrated good attention and concentration and persistence. His pace is considered to be severely below that of his peers, due to his general low intellectual ability.

Social Functioning: Mr. Healy reported no significant problems in his prior work relationships. He appears to have the ability to establish and maintain close ties with others. He was appropriate during this interview. By his report, he is becoming "grumpier" due to the pain. He can be expected to have moderate impairment in his relations in a work environment.

Ability to Adapt to Work: Mr. Healy appears to have the ability to carry out simple tasks in a full-time work setting, not considering any physical impairments that he may have. Due to his general low intelligence and his low academic skills, he would have marked difficulty in any job that required reading, math calculations, or writing.

### III. STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole. See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999). "Substantial evidence" is more than a mere scintilla, but less than a preponderance. See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971). The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed. See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence. See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive. See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987). Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

## IV. DISCUSSION

In his motion for summary judgment, plaintiff argues: (1) the ALJ failed to properly evaluate plaintiff's intellectual functioning in determining plaintiff's severe impairments; (2) In considering plaintiff's impairments, the ALJ rejected the opinions of Drs. Regazzi and Garland without providing legitimate reasons for doing so; (3) the ALJ improperly rejected plaintiff's testimony as not credible; and (4) hypothetical questions posed to the vocational expert failed to accurately reflect plaintiff's residual functional capacity.

### A. **Evaluation of the Medical Opinions**

In her second argument, plaintiff argues that the ALJ failed to properly evaluate the opinions of Dr. Regazzi, who performed a psychological evaluation, and Dr. Garland, who performed an orthopedic evaluation. The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional. See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987). The least weight is given to the opinion of a non-examining professional. See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether: (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and

convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.  While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester, 81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or examining professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional.  See id. at 831.  In any event, the Commissioner need not give weight to any conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion); see also Magallanes, 881 F.2d at 751.

         1.     Dr. Regazzi

As to Dr. Regazzi, the ALJ stated:

> In December 2007, the claimant underwent consultative psychological evaluation.  The claimant reported that he has never participated in psychiatric treatment and is not taking any psychiatric medication.  The claimant also admitted that he is independent in his activities of daily living, handles his own finances, and drives.  Upon examination, the claimant was described as borderline in academic testing including reading and math.  The claimant achieved IQ score in the upper 70s upon intelligence testing.  Nonetheless, although the psychologist suggested borderline intellectual functioning, he did not offer a psychiatric diagnosis.  The examiner also noted that the claimant's ability to perform unskilled work is intact, and indicated that the claimant would have problems performing work requiring math calculations or writing (Exhibit 14F).

Plaintiff contends that the ALJ failed to accurately summarize Dr. Regazzi's report.  Plaintiff

also argues that the "ALJ tacitly rejected Dr. Regazzi's assessed mental limitations without discussion." In response, defendant argues that Dr. Regazzi's Axis II diagnosis of borderline intellectual functioning is "arguably unfounded" because the doctor "had no access to Plaintiff's 'developmental' history. . . ." Defendant also asserts: "In any event, the ALJ's conclusion that Plaintiff was not limited by borderline intellectual functioning is supported by substantial evidence regardless of what Dr. Regazzi diagnosed or opined." Defendant concludes that any error with respect to Dr. Regazzi was harmless.

   The court agrees with plaintiff that the ALJ tacitly rejected Dr. Regazzi's opinions. Dr. Regazzi concluded that, due to general low intellectual ability, plaintiff's pace is "severely below that of his peers," his ability to get along with co-workers is moderately impaired, and his ability to adapt to work involving reading, math, or writing is markedly impaired. Because none of these limitations were included in the ALJ's residual functional capacity assessment, they were necessarily rejected. The court also agrees with plaintiff that, in rejecting Dr. Regazzi's opinions, the ALJ failed to articulate the reasons for doing so. While the reasons cited by defendant for rejecting Dr. Regazzi's opinions – that the doctor's diagnosis is unfounded and that the doctor's opinions are not supported by substantial evidence – may be legally valid reasons, it is for the ALJ not the court to set forth a rationale in the first instance. In other words, the court cannot substitute its own reasoning where none is provided by the ALJ.

   The next question is whether, as defendant asserts, any error is harmless. The Ninth Circuit has applied harmless error analysis in social security cases in a number of contexts. For example, in Stout v. Commissioner of Social Security, 454 F.3d 1050 (9th Cir. 2006), the court stated that the ALJ's failure to consider uncontradicted lay witness testimony could only be considered harmless ". . . if no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." Id. at 1056; see also Robbins v. Social Security Administration, 466 F.3d 880, 885 (9th Cir. 2006) (citing Stout, 454 F.3d at 1056). Similarly, in Batson v. Commissioner of Social Security, 359 F.3d 1190 (9th Cir. 2004), the court applied

harmless error analysis to the ALJ's failure to properly credit the claimant's testimony. Specifically, the court held:

> However, in light of all the other reasons given by the ALJ for Batson's lack of credibility and his residual functional capacity, and in light of the objective medical evidence on which the ALJ relied there was substantial evidence supporting the ALJ's decision. Any error the ALJ may have committed in assuming that Batson was sitting while watching television, to the extent that this bore on an assessment of ability to work, was in our view harmless and does not negate the validity of the ALJ's ultimate conclusion that Batson's testimony was not credible.
>
> Id. at 1197 (citing Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1990)).

In Curry, the Ninth Circuit applied the harmless error rule to the ALJ's error with respect to the claimant's age and education. The Ninth Circuit also considered harmless error in the context of the ALJ's failure to provide legally sufficient reasons supported by the record for rejecting a medical opinion. See Widmark v. Barnhart, 454 F.3d 1063, 1969 n.6 (9th Cir. 2006).

The harmless error standard was applied in Carmickle v. Commissioner, 533 F.3d 1155 (9th Cir. 2008), to the ALJ's analysis of a claimant's credibility. Citing Batson, the court stated: "Because we conclude that . . . the ALJ's reasons supporting his adverse credibility finding are invalid, we must determine whether the ALJ's reliance on such reasons was harmless error." See id. at 1162. The court articulated the difference between harmless error standards set forth in Stout and Batson as follows:

> . . . [T]he relevant inquiry [under the Batson standard] is not whether the ALJ would have made a different decision absent any error. . . it is whether the ALJ's decision remains legally valid, despite such error. In Batson, we concluded that the ALJ erred in relying on one of several reasons in support of an adverse credibility determination, but that such error did not affect the ALJ's decision, and therefore was harmless, because the ALJ's remaining reasons *and ultimate credibility determination* were adequately supported by substantial evidence in the record. We never considered what the ALJ would do if directed to reassess credibility on remand – we focused on whether the error impacted the *validity* of the ALJ's decision. Likewise, in Stout, after surveying our precedent applying harmless error on social security cases, we concluded that "in each case, the ALJ's error . . . was inconsequential to the *ultimate nondisability determination*."

> Our specific holding in Stout does require the court to consider whether the ALJ would have made a different decision, but significantly, in that case the ALJ failed to provide *any reasons* for rejecting the evidence at issue. There was simply nothing in the record for the court to review to determine whether the ALJ's decision was adequately supported.

Carmickle, 533 F.3d at 1162-63 (emphasis in original; citations omitted). Thus, where the ALJ's errs in not providing any reasons supporting a particular determination (i.e., by failing to consider lay witness testimony), the Stout standard applies and the error is harmless if no reasonable ALJ could have reached a different conclusion had the error not occurred. Otherwise, where the ALJ provides analysis but some part of that analysis is flawed (i.e., some but not all of the reasons given for rejecting a claimant's credibility are either legally insufficient or unsupported by the record), the Batson standard applies and any error is harmless if it is inconsequential to the ultimate decision because the ALJ's disability determination nonetheless remains valid.

In this case, because the ALJ did not provide any reasons for rejecting Dr. Regazzi's opinions, the Stout standard applies and the court must ask whether a reasonable ALJ would have reached the same disability determination had Dr. Regazzi's opinions been properly considered. The court answers this question in the affirmative. In particular, the court notes that plaintiff has had difficulties with intellectual functioning since his youth. This is reflected by evidence that he attended special education classes throughout high school. The court also notes that, since his youth, plaintiff has not complained of a worsening of deteriorating mental condition. Thus, the evidence indicates that his mental limitations have remained essentially the same throughout his life. Given that plaintiff was able to work up until his retirement and only stated that he stopped working due to his pain complaints, it is clear that his mental limitations did not affect plaintiff's ability to perform work activity. Certainly, plaintiff's mental limitations did not interfere with his ability to perform his past relevant work in the construction industry. Thus, the court finds that no reasonable ALJ would have reached a different conclusion as to plaintiff's mental limitations even had Dr. Regazzi's opinions been properly considered.

    2. <u>Dr. Garland</u>

    As to Dr. Garland, the ALJ stated:

> The record also shows that the claimant underwent orthopedic evaluation in March 2006. Upon examination, range of motion of the spine and wrists was somewhat limited, however, the claimant was neurologically intact. The examiner noted that the claimant was only precluded from repetitive heavy lifting, repetitive forceful pushing and pulling, repetitive over the shoulder work, and work requiring repetitive and forceful gripping, grasping, pinching, and torquing with his right hand (Exhibit 10F).

The court does not find any error. In fact, it does not appear that the ALJ rejected Dr. Garland's opinion, which was not inconsistent with the residual functional capacity finding of medium work. Dr. Garland stated that plaintiff would not be able to lift heavy weight or do forceful and/or repetitive tasks. This opinion, however, does not preclude medium work activities.

  **B.** **Plaintiff's Intellectual Functioning**

    In her first argument, plaintiff argues generally that "[s]tep two should not have been employed to screen out consideration of impairments which, when viewed singly and in combination, significantly limited Mr. Healy's ability to perform basic work activities on a sustained basis." In order to be entitled to benefits, the plaintiff must have an impairment severe enough to significantly limit the physical or mental ability to do basic work activities. See 20 C.F.R. §§ 404.1520(c), 416.920(c).[1] In determining whether a claimant's alleged impairment is sufficiently severe to limit the ability to work, the Commissioner must consider the combined effect of all impairments on the ability to function, without regard to whether each impairment alone would be sufficiently severe. See <u>Smolen v. Chater</u>, 80 F.3d 1273, 1289-90 (9th Cir. 1996); <u>see also</u> 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 404.1523 and 416.923. An impairment,

---

  [1] Basic work activities include: (1) walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. <u>See</u> 20 C.F.R. §§ 404.1521, 416.921.

or combination of impairments, can only be found to be non-severe if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work. See Social Security Ruling ("SSR") 85-28; see also Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir. 1988) (adopting SSR 85-28). The plaintiff has the burden of establishing the severity of the impairment by providing medical evidence consisting of signs, symptoms, and laboratory findings. See 20 C.F.R. §§ 404.1508, 416.908. The plaintiff's own statement of symptoms alone is insufficient. See id.

Regarding the severity of plaintiff's intellectual impairment, the ALJ stated:

> The claimant's medically determinable mental impairment of borderline intellectual functioning does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore nonsevere. In making this finding, the undersigned has considered the four broad functional areas set out in the disability regulations for evaluating mental disorders . . . . These four functional areas are known as the "paragraph B" criteria.
>
> The first functional area is activities of daily living. In this area, the claimant has no limitation. The claimant has not alleged impairment in this area, and he is independent in all activities of daily living.
>
> The next functional area is social functioning. In this area, the claimant has no limitation. The claimant has not alleged impairment in this domain, and the record shows that he has no problem interacting or communicating in an effective manner.
>
> The third functional area is concentration, persistence or pace. In this area, the claimant has mild limitation. Although mental status testing has reflected some impairment in this area, the claimant is independent in his activities of daily living, drives, performs home repairs, and handles his own finances. Moreover, the claimant has a history of skilled work, and he has not alleged deterioration in his mental status since he retired.
>
> The fourth functional area is episodes of decompensation. In this area, the record does not contain any evidence that shows that the claimant has experienced any episodes of decompensation.
>
> Because the claimant's medically determinable mental impairment causes no more than "mild" limitations in any of the first three functional areas and "no" limitation in the fourth area, it is nonsevere. . . .

///

///

The court finds no error. As discussed above, the record reflects that plaintiff's mental impairment has been with him essentially unchanged since his youth. The record also shows that, despite this impairment, plaintiff successfully engaged in full-time competitive work in the construction industry until his retirement. In addition, plaintiff stated that he stopped working due to physical symptoms and not due to mental limitations. Thus, it is clear that plaintiff's mental impairment poses for him no more than a minimal effect on his ability to work.

### C. Plaintiff's Credibility

The Commissioner determines whether a disability applicant is credible, and the court defers to the Commissioner's discretion if the Commissioner used the proper process and provided proper reasons. See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996). An explicit credibility finding must be supported by specific, cogent reasons. See Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990). General findings are insufficient. See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995). Rather, the Commissioner must identify what testimony is not credible and what evidence undermines the testimony. See id. Moreover, unless there is affirmative evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not credible must be "clear and convincing." See id.; see also Carmickle v. Commissioner, 533 F.3d 1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007), and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

If there is objective medical evidence of an underlying impairment, the Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence. See Bunnell v. Sullivan, 947 F.2d 341, 347-48 (9th Cir. 1991) (en banc). As the Ninth Circuit explained in Smolen v. Chater:

> The claimant need not produce objective medical evidence of the [symptom] itself, or the severity thereof. Nor must the claimant produce objective medical evidence of the causal relationship between the medically determinable impairment and the symptom. By requiring that the medical impairment "could reasonably be expected to produce" pain or another symptom, the Cotton test requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon.

80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).

The Commissioner may, however, consider the nature of the symptoms alleged, including aggravating factors, medication, treatment, and functional restrictions. See Bunnell, 947 F.2d at 345-47. In weighing credibility, the Commissioner may also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5) physician and third-party testimony about the nature, severity, and effect of symptoms. See Smolen, 80 F.3d at 1284 (citations omitted). It is also appropriate to consider whether the claimant cooperated during physical examinations or provided conflicting statements concerning drug and/or alcohol use. See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002). If the claimant testifies as to symptoms greater than would normally be produced by a given impairment, the ALJ may disbelieve that testimony provided specific findings are made. See Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

As to plaintiff's credibility, the ALJ stated:

> At the hearing, the claimant admitted that he retired in October 2003, however, he stated he believes that he cannot work because of joint pain. He also stated that he worked for 18 years as concrete labor foreman. The claimant indicated that he can only stand for 10 minutes at a time, and not more than 30 minutes in an 8 hour day. The claimant noted that he is independent in his activities of daily living, performs some house work, and occasionally rides his motorcycle. The claimant also stated that although his ability to read is somewhat limited, he does not have a mental impairment.
>
> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below.

///

> Although the claimant alleged symptoms such as disabling back and joint pain, the record does not contain any objective findings which support the severity of his allegation. Moreover, the claimant is not undergoing any regular, ongoing, or specialized medical treatment for his symptoms and examinations have not reflected any neurological involvement, or muscle wasting or atrophy, usually associated with pain and inactivity.
>
> The record does not contain any diagnostic testing such as x-rays, tomography, and magnetic resonance imaging, which reflects any serious abnormality.
>
> In addition, the record shows that the claimant participated in chiropractic therapy through 2005, however, the record does not show that he is undergoing any additional alternative pain management program for his symptoms such as physical therapy or a pain management program. Moreover, examining physicians have not suggested any additional diagnostic testing, or that the claimant be hospitalized for the further investigation of his complaints.
>
> The claimant has not indicated that his medication is not effective and the record suggests that the claimant remains active despite his complaints. The record shows that the claimant travels, rides a motorcycle, and perform home repairs and yard work.
>
> In sum, the above residual functional capacity assessment is supported by the objective evidence of record, as well as the opinions of the physician who conducted the most comprehensive examination of record. The Administrative Law Judge also notes that the record does not contain any objective evidence which reflects that the claimant's ability to sit, stand, and walk is seriously limited. Although the record shows that the claimant may experience some exacerbation in his symptoms with heavy, forceful work, above restrictions would accommodate any limitations that he may have. Furthermore, the claimant's demonstrated activities appear to be compatible with the ability to perform medium work.
>
> In addition, although mental status testing reflected some limitations in the claimant's ability to read and write, he has a history of successfully performing skilled work as a labor foreman and he has not reported any deterioration in his cognitive abilities since he retired. Moreover, the claimant's daily activities do not suggest any serious problem in his ability to perform the mental demands of his past work.

Plaintiff argues: (1) the ALJ erred in saying that the record does not contain diagnostic testing data showing a serious abnormality; (2) the ALJ erred in saying that plaintiff has not undergone physical therapy or pain management programs; and (3) the ALJ erred in stating that plaintiff remains active despite his complaints.

///

1        The court finds no errors.  As to plaintiff's first argument, while plaintiff is correct
2 that the record does in fact contain diagnostic testing data, plaintiff is not correct that such data
3 shows a serious abnormality.  To the contrary, and as the ALJ accurately observed, the diagnostic
4 testing data shows only mild to moderate changes.  As to plaintiff's second argument, while the
5 record does in fact reflect that plaintiff has attended chiropractic care and that he was prescribed
6 physical therapy, the ALJ's characterization of plaintiff's course of medical treatment is accurate
7 inasmuch as plaintiff has consistently sought only conservative care consistent with mild
8 symptoms.

9        Finally, as to plaintiff's daily activities, the court rejects plaintiff's assertion that
10 the ALJ in any way mischaracterized the record.  A review of plaintiff's chiropractic treatment
11 records alone suffices to illustrate the accuracy of the ALJ's statement that plaintiff remains
12 active despite his complaints of disabling pain.  While plaintiff stated on his application for
13 benefits that he became unable to work due to disability as of October 1, 2003, the chiropractic
14 records reflect that plaintiff engaged in the following activities after that date:  March 8, 2004 –
15 yard work; March 23, 2004 – installed a sprinkler system; March 26, 2004 – ditch digging/
16 trenching;  April 27, 2004 – used a grinder; October 8, 2004 – moving boxes and furniture;
17 November 8, 2004 – yard work; November 12, 2004 – yard work; December 22, 2004 – yard
18 work; January 21, 2005 – yard  work; February 1, 2005 – one-week trip to Oregon to assist with
19 home repairs and yard work; March 4, 2005 – trimming trees and clearing weeds; March 18,
20 2005 – cutting trees and installing bathtub; April 20, 2005 – repairing a garage door; April 24,
21 2005 – yard work; May 6, 2005 – trip to Oregon where he did house work and yard work; and
22 June 27, 2005 – mowing the lawn.  As the ALJ noted, these are not the activities of a person
23 experiencing disabling pain.
24 / / /
25 / / /
26 / / /

### D. Hypothetical Questions

Hypothetical questions posed to a vocational expert must set out all the substantial, supported limitations and restrictions of the particular claimant. See Magallanes v. Bowen, 881 F.2d 747, 756 (9th Cir. 1989). If a hypothetical does not reflect all the claimant's limitations, the expert's testimony as to jobs in the national economy the claimant can perform has no evidentiary value. See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991). While the ALJ may pose to the expert a range of hypothetical questions based on alternate interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's determination must be supported by substantial evidence in the record as a whole. See Embrey v. Bowen, 849 F.2d 418, 422-23 (9th Cir. 1988).

Plaintiff argues:

> Notwithstanding credible evidence of Mr. Healy's impairments and functional limitations, the ALJ concluded that Mr. Healy had the residual functional capacity to perform the full range of medium work. TR 16. In reaching this RFC determination, the ALJ rejected the examining opinions of Drs. Regazzi and Garland, rejected Mr. Healy's diagnosed borderline intellectual functioning as a severe impairment, and rejected Mr. Healy's testimony without articulating legitimate reasons for so doing. . . .

For all of the reasons discussed above, the court finds that the ALJ correctly determined that plaintiff has the residual functional capacity for medium work.

Plaintiff also argues that the ALJ erred in concluding that plaintiff could perform his past relevant work because such work involved exertion above the medium level. As to past relevant work, the ALJ stated:

> In comparing the claimant's residual functional capacity with the physical and mental demands of this [past relevant] work [as a concrete labor foreman], the undersigned finds that the claimant is able to perform it as generally performed.
>
> In this respect, at the hearing the vocational expert noted that the job of concrete labor foreman is generally performed at the light exertional level in the national economy.

///

According to plaintiff, his past relevant work as actually performed involved at times much more than medium work.  He concludes that, for this reason, the ALJ erred in finding that, on the one hand, he retains the capacity for medium work and, on the other hand, he could perform his past work.  Plaintiff's argument appears to stem from the belief that a claimant must be able to perform past relevant work as actually performed in order to be found not disabled.  This is incorrect.  A claimant can perform past relevant work if he or she retains the ability to do that work as actually performed or as generally performed in the national economy.  See SSR 82-62. Here, the vocational expert testified that the job of concrete labor foreman is generally performed at the light exertional level, which is within plaintiff's residual functional capacity.  Therefore, the ALJ did not err in concluding that plaintiff can perform his past relevant work as such work is generally performed in the national economy.

### V.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment (Doc. 20) is denied;
2. Defendant's cross-motion for summary judgment (Doc. 28) is granted; and
3. The Clerk of the Court is directed to enter judgment and close this file.

DATED:  September 29, 2010

**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE